**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**YELLOW PAGES PHOTOS, INC.,**

      **Plaintiff,**

**vs.**                                          **CASE NO.: 8:12-cv-00755-RAL-TBM**

**ZIPLOCAL, LP and YELLOW PAGES
GROUP, LLC,**

      **Defendants.**

_____/

## PLAINTIFF'S MOTION FOR SANCTIONS

This case should be decided on its merits.  The defense, however, seems determined to ensure that does not happen.  Defendants have not simply failed to produce material discovery specifically requested by Plaintiff, but they have disregarded this Court's admonitions and orders and knowingly withheld and actively concealed evidence that undermines their positions.  Much of this was revealed by the contents of a file folder referencing Plaintiff named "DONT SEND YET - FTP - YCB-ADS ARCHIVES - DO NOT SEND OR DO NOT SEND YET", emails, and a log file for the FTP site found on Ziplocal's CorpX2 server.[1]

### I.    INTRODUCTION

When this case first began, Defendant Yellow Pages Group, LLC ("YPG") represented to Plaintiff and the Court that it had never received any of Plaintiff's photographic images at issue from co-Defendant Ziplocal, LP ("Ziplocal").  Not only has that claim proven untrue, but a review of the data from Ziplocal's forensically-imaged CorpX2 server has turned up further

---

[1] The contents of the "DO NOT SEND OR DO NOT SEND YET" folder were moved there from the FTP site on the server and have not been previously produced.  The log file was also moved from the FTP site, but discovered by Plaintiff elsewhere on the server.  To give the Court a feel for how much data is in the "DO NOT SEND OR DO NOT SEND YET" folder, a listing of the sub-folders in the folder is attached as Exhibit 1.

transferred copies of Plaintiff's and many other photos, as well as ads built by YPG containing Plaintiff's photos, that have not been previously produced.

YPG represented that it could not determine which ads in its system contained Plaintiff's photos and that it could not even begin searching for Plaintiff's photos in its system until March of 2013.  However, the information gleaned from the CorpX2 server reveals that YPG and Ziplocal had in fact identified nearly 1,700 ads and photos in the spring and summer of 2012 and colluded at that point in time to replace Plaintiff's photos in ads that could only be found online and then re-publish those altered ads to the Internet.

YPG represented that it had produced everything Plaintiff requested in discovery.  Yet recent testimony at Ziplocal's reopened 30(b)(6) deposition revealed that some 150-200 additional online-only directories, which include display ads containing photos, have not been produced.  Further, other online-only products created by YPG for Ziplocal called "banner" ads and "box" ads that likewise contain photos, including Plaintiff's photos, have not been produced at all.  In addition, a review of the CorpX2 server data reveals not only copies of photos, but also ads, complete directories, and other material documents that have not been produced by YPG or Ziplocal that are in the possession of both, as well as graphics files that were transferred by Ziplocal to YPG via the FTP site on the server that no longer exist on the server.

This discovery abuse has been revealed in part by information contained on the CorpX2 server, namely data from the FTP site on the server through which YPG and Ziplocal exchanged electronic files and the log file for the FTP.  Both this data and the log file were moved from the FTP site after the commencement of this litigation.  In addition, the content of non-privileged email communications between YPG and Ziplocal, including between high-ranking officers of the two companies, is revealing.  These emails, which specifically reference Plaintiff, its photos,

and ads containing them, were neither produced nor logged in a privilege log by the Court-ordered September 13, 2013 deadline, yet are relevant and responsive to Plaintiff's discovery.

In addition, agreements that were the subject of the Court's August 22, 2013 Order, but not produced by the Court-ordered deadline, were discovered on the CorpX2 server.   Other agreements, namely the Canpages agreements that were specifically identified in Plaintiff's Renewed Motion to Compel and ordered to be produced, were not produced by Ziplocal by the Court-ordered deadline.  Plaintiff identified to Ziplocal its own law firm that likely had them— Weil, Gotshal & Manges LLP.   Yet Ziplocal did not procure or produce the agreements from Weil Gotshal by the deadline.  Plaintiff then subpoenaed the agreements, and received them from Weil Gotshal less than two weeks later.

As to Canada, both YPG and Ziplocal were disappointingly unknowledgeable at their 30(b)(6) depositions, notwithstanding their claim that Plaintiff did not need to depose Yellow Pages Group Corp. in Canada.  This lack of knowledge is particularly shocking given that one of YPG's 30(b)(6) designees was its parent company's in-house counsel and Director of Legal Affairs from Canada, who testified she knew exactly who within the company to ask to prepare herself to testify, but for some reason did not.   When it came to answering questions about folders in YPG's systems named "YPPI-DO NOT USE" containing nearly 2,400 copies of Plaintiff's photos, no one knew anything about them, who created them, where the photos in them originated, or what happened to the rest of the stock photographic image library that YPG received from Volt.   The claimed lack of knowledge on the part of YPG's and Ziplocal's designees is at best willful blindness, notwithstanding a duty to prepare for the depositions.  It is clear that the shell game among the Yellow Pages Group family of companies continues.

Ten months into the discovery period, Plaintiff is uncovering material discovery that Defendants have not only failed to produce, but have apparently knowingly withheld and actively concealed.  This case should be decided on its merits, with all parties having a complete picture of the facts of the case.  Defendants, however, continue to pick and choose what discovery to produce, deny the existence of missing discovery, and then produce withheld discovery only upon being caught with it.  This misconduct has so undermined Plaintiff's ability to prepare its case that severe sanctions are at this point warranted.

## II.   FACTUAL BACKGROUND

At the outset of discovery in December 2012, Plaintiff served interrogatories and requests for production on Defendants requesting, among other things, that they identify and produce all agreements and other documents sufficient to describe the relationship between them, all of Plaintiff's photos in their possession, custody, or control, and all ads and other documents containing the photos worked on by YPG for Ziplocal or any other party.  (Dkt. 135, Exhs. 1-2; Dkt. 139, Exhs. 1-2).  Irrespective of whether Defendants are correct in their contractual interpretation and other non-infringement arguments, the relationship between Ziplocal and YPG, and YPG's possession and use of the photos, are pivotal issues in this case.

Ziplocal produced copies of some of Plaintiff's photos and some ads, but evidently not even close to everything.  YPG, consistent with its theme that it had never received any of Plaintiff's photos from Ziplocal, responded that it could not identify the photos or ads containing them and would produce directories so that Plaintiff could identify and produce back to Defendants ads in the directories containing the photos.  (Dkt. 135, Exhs. 3-4; Dkt. 139, Exhs. 3-5).  The production of these directories for this purpose was in and of itself a tacit admission that

the directories contained ads that YPG had created for Ziplocal.   Why else produce the directories?  To waste Plaintiff's time and money?

**A.      From the outset, YPG sought to mislead Plaintiff and the Court as to several material facts: (i) when YPG and Ziplocal began doing business together, (ii) what electronic files Ziplocal had provided to YPG, and (iii) YPG's and Ziplocal's ability to search for ads containing Plaintiff's photos and locate the photos themselves.**

> *Since March 2011, YPG has provided [Ziplocal] with publishing services for its print and digital products pursuant to an agreement between our companies.  (Dkt. 13 at 2)*

The very first submission by YPG in this case was a motion to dismiss for lack of personal jurisdiction, filed May 16, 2012.   (Dkt. 11).   This motion was supported by a Declaration of Michelle Meloy, Senior Manager, Ad and Page Services—US Operations, for YPG.  (Dkt. 13).  Ms. Meloy had been with YPG since its founding in 2008, and before that with Volt Information Sciences, Inc., the company whose directory systems and services business effectively became YPG, since 1988.  *See* Exhibit 2, Meloy June 20, 2013 Deposition Transcript at 7, 16-20 ("Meloy Dep. I").  In Ms. Meloy's role as Senior Manager for YPG, she has been in charge of YPG's directory and ad production teams since 2008.  Meloy Dep. I at 11, 30.  Ms. Meloy has given several Declarations on behalf of YPG (Dkt. 13, 31, 34, 157) and was one of YPG's three designees for its 30(b)(6) deposition in this case.

In Ms. Meloy's May 16, 2012 Declaration, she stated very clearly and directly that YPG had provided services to Ziplocal since March of 2011.  (Dkt. 13 at 2).  This was repeated in a further Declaration by Ms. Meloy filed early in the discovery period:

> In early 2011, YPG LLC began providing production services to Ziplocal, a publisher of phone directories.  YPG LLC began providing production services to Ziplocal for Ziplocal's legacy directories (which it had published under the Phone Directories Co. name), as well as directories originally published by Volt Information Sciences, Inc.

(Dkt. 157 at 1).

As discussed in Plaintiff's Renewed Motion to Compel, these statements were false—YPG began providing production services to Ziplocal a year before in early 2010—likely when Plaintiff's photos were originally transferred by Ziplocal to YPG. (Dkt. 186 at 5-7). The explanation—it was a mistake. *See* Exhibit 3, Meloy Sept. 25, 2013 Deposition Transcript at 186-90 ("Meloy Dep. II"). The same mistake in short declarations twice, a mistake which if not discovered would have shifted the beginning of the time frame for discovery from the beginning of 2010 to the beginning of 2011. YPG's desire to shift the focus of discovery from 2010 to 2011 is reemphasized by the examination of its systems conducted by its consultant James Mercer, who reviewed only FTP transfers from 2011, not 2010, in a search designed to bolster the claim that YPG never received Plaintiff's photos from Ziplocal. (Dkt. 158). The log file for the FTP discovered on the CorpX2 server tells a much different story.

> *YPG, LLC never actually received any of Plaintiff's stock photographs from Ziplocal*
> *instead receiving advertisements from Ziplocal. (Dkt. 96 at 3)*

Very early on, during the jurisdictional phase of this case, YPG set the tone for its defense—that Ziplocal had only transferred finished advertisements to YPG, not standalone photos. (Dkt. 96 at 3). As discussed in Plaintiff's Motion for Entry of Preservation Order, Yellow Pages later discovered in YPG's own production of supposedly everything it had received from Ziplocal via an FTP site on Ziplocal CorpX2 server over 18,000 stand-alone photographic images, and more importantly hundreds of Plaintiff's photos among those stand-alone images. (Dkt. 174 at 5, Exhs. 5-8). Now, after reviewing the log files for the FTP and contents of the forensically-imaged Ziplocal CorpX2 server, Plaintiff has discovered that more photos than that were transferred by Ziplocal to YPG.

> *We have given them that entire file. Okay? So they now know everything, everything that was*
> *transferred as part of this change of production moving from Ziplocal over to YPG. They have a*
> *complete record of all the stuff that we got, whether it's ads, whether it's images, whatever.*
> *(Dkt. 166 at 23)*

*They have a copy of what was transferred because we gave it to them.  (Dkt. 213 at 32)*

On May 13, 2013, Plaintiff received from YPG a production of electronic files that were purportedly transferred by Ziplocal to YPG via an FTP site on the Ziplocal CorpX2 server.  *See* Exhibit 4.  This FTP site allowed Ziplocal to transfer electronic files, including files containing photos, ads, directories, and other items, into the FTP and YPG to copy them out of the FTP into its system via the Internet, and vice versa.  *See* Exhibit 6, Declaration of Adam D. Sharp ("Sharp Decl.") at ¶ 10.  As it turns out, the files produced by YPG as having been transferred through the FTP include files that originated with both Ziplocal and YPG, rendering it entirely unreliable as an indicator of the source of any particular file.[2]  The implication that "everything" in that production "mov[ed] from Ziplocal to YPG" was misleading.  Further, the claim that it was a complete record of what was transferred was false.

The way a server like the CorpX2 server operates, the server generates a log for files that are uploaded to and downloaded from an FTP site that for each transaction tracks information such as (i) the date and time of the transaction, (ii) the user login name for the transaction, (iii) the Internet domain from which the user accessed the FTP, (iv) whether the user moved or copied the file into or out of the FTP, (v) the name of the file folder on the FTP to/from which the file was uploaded/downloaded, and (vi) the name of the file uploaded/downloaded.  Sharp Decl. at ¶ 11.  A log for the FTP site used by Ziplocal and YPG to exchange files was found on the CorpX2 server.  Sharp Decl. ¶ 12.  Curiously, the log file had been moved from the FTP to a file folder on a different part of the CorpX2 server named "YPPI_Legal."[3]  *Id*.

---

[2] For instance, Ms. Meloy testified at her deposition that a particular ad for a company named Here 2 There Movers had been created by Volt, whose systems and services business essentially became YPG in late 2008.  Meloy Dep. I at 180-81.  That ad was in the FTP data produced by YPG.  *See* Exhibit 5.

[3] This folder was inspected for potentially privileged documents, which Plaintiff's computer forensic expert quarantine and provided to counsel for Ziplocal for review.  Certain of those documents, namely email

The log for this FTP indicates that YPG and Ziplocal first exchanged files through the FTP on June 11, 2010, and last exchanged files through it on May 17, 2013.  Sharp Decl. ¶ 14. All in all, YPG and Ziplocal exchanged 388,168 files through this FTP site, 236,132 of which went out from Ziplocal to YPG and 152,036 of which came in from YPG to Ziplocal.  Sharp Decl. ¶ 15.  There were 222,527 files in the FTP production, roughly half of what was exchanged by YPG and Ziplocal.  Sharp Decl. ¶ 16.  Therefore not only is it clear that the FTP production did not contain all files exchanged between YPG and Ziplocal, but, upon any basic discovery investigation, it would have been very easy for the parties and their counsel to see that the production did not contain all exchanged files.

In reviewing the contents of the FTP site, many of the file folders and their contents that were at some point on the FTP site are no longer there, and it would be almost impossible to track them all to where they might be in Ziplocal's system, if they are there at all.  Sharp Decl. ¶ 17.  However, a number of the folders, still containing some files, were discovered on the CorpX2 server in a subfolder created on February 12, 2013 in the "YPPI_LEGAL" folder named "DONT SEND YET - FTP - YCB-ADS ARCHIVES - DO NOT SEND OR DO NOT SEND YET", to which they had apparently been moved.  Sharp Decl. ¶18.  These are not legal files, but rather files that YPG and Ziplocal exchanged via the FTP site.

There are many sub-folders in this folder, including sub-folders with names such as:

Video Lite Photos
New ads to post
SOLD SPECS TO ZIPLOCAL
SPEC ARTWORK TO YPG
YCD_Ad_Files_12-15-10
YCD_Ad_Files_12-16-10
YCD files to Ziplocal
YCD Missing PA

---

communications, are the subject of Plaintiff's pending Motion for Finding of Privilege Waiver, or in the Alternative, to Conduct an *In Camera* Review.

Missing Art Files

*See* Exhibit 1.  Plaintiff discovered in these folders thousands of additional photos and ads that

had been exchanged, including further copies of Plaintiff's photos and ads containing them.

Sharp Decl. ¶ 20.  Further, there are files that traveled through the FTP that were clearly graphics

files that are no longer in the FTP, so it may never be known whether they were Plaintiff's

photos or ads containing them.  Sharp Decl. ¶ 21.  One thing is clear, though, Plaintiff has not

received "everything," not even close.

For example, an ad file was discovered in the "SOLD SPECS TO ZIPLOCAL"

subfolder[4] built for Vancouver Goodyear Auto Center.  Sharp Decl. ¶ 24, Exh. D.

- The FTP log for this ad file indicates it was uploaded to the FTP site by YPG at 7:58am on February 3, 2011.  Sharp Decl. ¶ 24.  It was downloaded from the FTP site by Ziplocal about an hour later.  *Id.*
- Plaintiff can find no record in the FTP log of this ad going out from Ziplocal to YPG previously.  *Id.*
- The file is in .eps file format, the format in which YPG generally saves ad files it builds (Ziplocal generally saved them in .indd file format and transferred ads to YPG via the FTP in .pdf file format).  *Id.*; Exhibit 7, Scott Bialor Sept. 9, 2013 Deposition Transcript at 170-71, 184-85 ("Bialor Dep."); Exhibit 8, Hayley Pugh, May 16, 2013 Deposition Transcript at 75-76, 82 ("Pugh Dep.").
- The metadata for the file indicates it was created on February 3, 2011, using Adobe Illustrator, the application generally used by YPG (Ziplocal generally used Adobe InDesign), by a person named Mike Birkey.  Sharp Decl. ¶ 24; Bialor Dep. at 170-71; Pugh Dep. at 75-76, 82.
- Mike Birkey appears to have been a Senior Graphics Designer for YPG on February 23, 2011.  *See* Exhibit 9.
- The ad contains one of Plaintiff's photos.  Sharp Decl. ¶ 24, Exh. D.

It seems clear that this ad was created by YPG using one of Plaintiff's photos, yet YPG claims it

has not created ads using Plaintiff's photos or for that matter any stock photos other than those in

an online library provided by Getty Images.  Meloy Dep. I at 73-74; Meloy II at 171.  This

---

[4] A "spec" (short for "speculative") ad is an ad built by a publisher in hopes of an advertiser buying it, rather than at the advertiser's request.

electronic ad file was not in the FTP or DVD files produced to Plaintiff by YPG, nor was it produced to Plaintiff by Ziplocal other than as part of a finished directory.

YPG will likely attempt to explain away this ad and photo by claiming the photo in this ad was licensed to Volt (which it was) and that it is permitted to use pursuant to a 2009 agreement between Plaintiff and YPG (on which the parties disagree).  Such an explanation, however, would disregard the testimony on behalf of YPG that (i) since it began doing business it has used no photos other than those procured from an online library licensed from Getty Images, and (ii) it does not use any stock photography existing in its system.  Meloy Dep. I at 73-74; Meloy Dep. II at 171.  It also would not explain ads such as the Lee Chiropractic and Trugold, LLC ads attached as composite Exhibit 10, which (i) were not in the FTP or DVD files produced to Plaintiff by YPG, (ii) were not produced to Plaintiff by Ziplocal other than as part of finished directories, and (iii) contain photos from Plaintiff's Bicycles and Home Features and Maintenance 4 CD, which were certainly not licensed to Volt (or for that matter Canpages).  Moreover, the Vancouver Goodyear ad is not the only example of an ad found in the "SOLD SPECS TO ZIPLOCAL" subfolder containing one of Plaintiff's images that appears to have been built by YPG; the same holds true for another ad built for McMinnville Self-Storage.  Sharp Decl. ¶ 25, Exh. E.

*We've produced everything he wants.  (Dkt. 166 at 22)*

As the Court can see, it is not possible to just look at the face of a paper ad and determine anything about who built it or where the photo in it originated.  Indeed, in order to answer questions about specific ads, Ms. Meloy has had to refer to YPG's electronic files and has the benefit of other non-public information about YPG's business.  Meloy Dep. II at 28-40.  The electronic files themselves and associated metadata and other data provide information as to when an ad was created and by whom.  YPG and Ziplocal know this, and for this reason have

10

withheld electronic files for ads YPG created.  The Vancouver Goodyear and McMinnville Self-Storage ad files are in YPG's possession.  YPG apparently created them, and there is a record of YPG transferring them to Ziplocal through the FTP on the CorpX2 server.  They are in Ziplocal's possession.  There's a record of Ziplocal transferring them out of the FTP.  Why have they not been produced by either party?  Why is it that Plaintiff only has possession of these ad files as a result of the Court ordering a forensic image of a Ziplocal server?

At the commencement of discovery this past December, Plaintiff served written discovery on YPG requesting, among other things, that it identify and produce all of Plaintiff's photos (both unedited and edited, i.e. cropped, flipped, re-sized, re-colored, overlaid with other images, or modified in any other manner) in its possession, custody, or control, and all ads and other documents containing the photos worked on by YPG for Ziplocal or any other party.  (Dkt. 135, Exh. 2).  YPG responded with a litany of objections such as:

- "[P]laintiff has refused to inform YPG LLC about which of plaintiff's photos plaintiff believes may be found among the advertisements."
- "[I]t would impose undue burden and cost upon YPG LLC to determine which advertisements contain any of Plaintiff's Photographs."

(Dkt. 135, Exh. 4).  YPG concluded by responding that it would produce directories it worked on for Ziplocal, which Plaintiff could then review to identify ads containing its photos.  *Id.*  Plaintiff served similar discovery on Ziplocal, requesting in addition copies of all directories published by Ziplocal since January 1, 2010.  (Dkt. 139, Exh. 2).  Unlike YPG, Ziplocal agreed to produce photos and ads containing Plaintiff's photos to the extent it could locate them, and did in fact produce photos and some ads.  Ziplocal also agreed to produce directories.  (Dkt. 139, Exh. 4).

YPG and Ziplocal then together provided Plaintiff with nearly 600 directories[5] to review, and Plaintiff has in turn spent the last six months diligently reviewing, identifying, and producing back to YPG and Ziplocal ads that contained Plaintiff's photos, more than 7,000 ads in all, anticipating Defendants would in turn use the produced ads to try to track the source(s) of the photos and provide other information back to Plaintiff, such as the electronic files relative to the ads and revenue received by each Defendant from each ad.[6]  Not only have YPG and Ziplocal responded with almost nothing in return, but electronic ad files like the Vancouver Goodyear and McMinnville Self-Storage ads have been moved from the FTP server, withheld, and hidden in a folder named "DO NOT SEND OR DO NOT SEND YET."

So not only have YPG and Ziplocal not produced "everything" that was transferred by Ziplocal to YPG as was represented to Plaintiff and the Court on multiple occasions, they have not produced everything they are required to produce under the discovery rules.  The rules are supposed to be self-executing, and the only thing Plaintiff wants is discovery to which it is entitled in this case.  It is apparent now YPG received copies of Plaintiff's photos from Ziplocal it has not produced, and built ads for Ziplocal using Plaintiff's photos it has not produced.

In addition, in the last few weeks Plaintiff has learned there are somewhere between 150-250 additional directories and other online display ads that have not been produced.  First, there were electronic copies of about 39 additional print directories found in the "DO NOT SEND OR DO NOT SEND YET" folder on Ziplocal's server, all for the years 2012 and 2013, that had not

---

[5] This does not include directories published by Yellow Pages Group Corp. in Canada produced by YPG in the last couple months.  It is interesting that YPG can produce materials from Canada when it wants, but in the next breath claim ignorance of activities taking place in Canada, such as how Plaintiff's photos that were not licensed to either Volt or Canpages are showing up in video ads created by Yellow Pages Group Corp. for its advertisers.

[6] Pursuant to 17 U.S.C. § 504(b), a copyright owner is entitled to recover from an infringer, in addition to actual damages resulting from the infringement, any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages.  In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue.  It is the infringer's burden to prove its deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

been previously produced.  Sharp Decl. ¶ 27.  Second, and more troubling, it has now been revealed that there is a set of online-only directories published by Ziplocal in addition to print directories.[7]  These online-only directories may include display ads containing photos.  *See* Exhibit 11, 30(b)(6) and individual Deposition of Geri Suster Sept. 30, 2013 Transcript at 46, 472-74 ("Suster Dep.").  Third, Ziplocal publishes other types of online-only ads, called "banner" ads and "box" ads, which may include photos and for several years have been produced for Ziplocal by YPG.  Suster Dep. at 390-99.  These banner ads and box ads are depicted in an in-house training piece received from Ziplocal, which itself was discovered on the CorpX2 server.  *See* Exhibit 12.  In fact, one of the box ads in the piece, appearing on page 11, includes one of Plaintiff's photos.  *Id*.  No banner ads or box ads <u>at all</u> have been produced.  Critically, if YPG and Ziplocal cannot determine whether a particular photo belonging to Plaintiff is in any particular ad, why have these online directory, banner, and box display ads not been produced for review?  They apparently can and do include Plaintiff's photos.

*We couldn't look for those photos until [March 21, 2013].  (Dkt. 166 at 23)*

As it turns out, YPG and Ziplocal have not only withheld photos, ads, and directories, but they have been able to identify specific photos belonging to Plaintiff and specific ads containing the photos.  In April of 2012, right after this lawsuit was commenced, Ziplocal began searching for Plaintiff's photos and ads containing them.  *See* Exhibit 13 (4/30/12 email among Ziplocal employees, the subject line of which is "Find Art & Images – AE Photos files script – YPPI").

By the beginning of May, Geri Suster, then Vice President of Operations for Ziplocal, was discussing with Chris Finch, Michelle Meloy,[8] and Michella Ehrhart, all Managers at YPG,

---

[7] Ziplocal publishes digital copies of its print directories on its website at <u>www.ziplocal.com</u>.  These are different from the referenced online directories.

[8] Ms. Meloy testified that the only thing she had researched or been involved had been received through counsel, not from Ziplocal.  Meloy Dep. I at 168-69.

checking ads "for photos with unknown origin and replac[ing] them with Getty images" and deleting "questionable art from YPG servers."   *See* Exhibit 14 (5/1/12 email chain among Defendants' employees with the subject line "YPPI case question").   This is interesting given the testimony that YPG supposedly has no way to track what images are in what ads.   Meloy Dep. I at 155-56; Exhibit 15, Treena Cooper Sept. 26, 2013 Deposition Transcript at 85-86, 259-61 ("Cooper II").

By June 2012, Ziplocal provided YPG with a spreadsheet identifying ads with Plaintiff's photos in them that YPG "need[ed] to replace."   *See* Exhibit 16 (6/11/12 email chain, the subject line of which is "Art to replace").   It is unclear what YPG did with respect to these ads.

Further, by August of 2012 YPG had located a group of online-only ads containing Plaintiff's photos, which it "corrected" by replacing the photos in them and then re-publishing them to the Internet.   *See* Exhibit 17 (8/9/12 email chain among YPG and Ziplocal employees, including Mr. Finch and Ms. Suster).   Yet YPG objected to Plaintiff's discovery claiming it would impose undue burden and cost on YPG to determine which ads contain Plaintiff's photos. YPG has not produced electronic files for the ads from its system, much less one in which it replaced one of Plaintiff's photos.

The gamesmanship is remarkable.   The failure to produce relevant evidence is disturbing. YPG and Ziplocal have known right where the evidence was, but consciously decided to withhold it.   The fact that evidence has not been preserved and may have now been destroyed, specifically files that were exchanged between Ziplocal and YPG through the FTP site that neither YPG nor Ziplocal has produced and are no longer on the FTP site, is beyond problematic.

**B.      YPG provided no answers regarding the source of Plaintiff's photos in video ads its Canadian affiliate Yellow Pages Group Corp. is building and publishing for advertisers and claimed information as to efforts undertaken to locate Plaintiff's photos in YPG's system was privileged.**

*Whatever information they need to get about what YPG, LLC, did vis-à-vis Ziplocal, they can get from Ziplocal and YPG, LLC.  (Dkt. 213 at 13)*

*Where are the photos coming from?  He knows where they are coming from.  They were licensed by his client to a Canadian entity called Canpages, which was purchased by Yellow Pages Corp.  Likewise, the 1200 photos we have received, after paying large sums of money to the plaintiff, from the plaintiff.  That's where they came from.  So there's not a reason to go off to the north, into Canada on this fishing expedition.  (Dkt. 213 at 14)*

Plaintiff requested the issuance of letters rogatory for a deposition *duces tecum* of Yellow Pages Group Corp.  (Dkt. 195).  One of the things Plaintiff needs to explore is how certain of its photos, which were not licensed to Canpages or Volt, are making their way into video ads published by YPG's affiliate Yellow Pages Group Corp.  *Id.*; (Dkt. 213 at 15).  Gregory Shearer, Vice President, Business Solutions of YPG, testified that YPG provides services to Yellow Pages Group Corp., including ad and website building services, and the two entities share the same system containing graphics, which are "passed back and forth" between the United States and Canada.  *See* Dkt. 97 Ex. 2 at 43-47, Deposition of Gregory Shearer at 19-21, 46-47, 56-57, 119.[9] Although Ziplocal did not object to the issuance of letters rogatory, YPG strenuously opposed the motion, arguing in part that Plaintiff could find out what it needed to from YPG.  (Dkt. 213 at 13-14).  Whether photos licensed for use only by Ziplocal, only in Ziplocal publications, are now being used in publications of others (in this instance Yellow Pages Group Corp.) as a result of Ziplocal's unauthorized transfers is significant to the economic damages analysis in this case according to YPG's damages expert.

The 30(b)(6) notice for YPG's deposition attached screen shots from two video ads published by Yellow Pages Group Corp. on its yellowpages.ca website and stated that Plaintiff would inquire of YPG:

---

[9]  The transcript of the deposition of Gregory Shearer is attached as Exhibit B to the Declaration of Kevin M. Bovard and was filed under seal.

> Any information that YPG has on the [video advertisement], including, but not limited to, what involvement YPG had with each advertisement, who created each advertisement, when each advertisement was created, the source of the photographic images in the advertisements, and what kind of records or files are kept on each advertisement.

YPG's 30(b)(6) designee Michelle Meloy testified that Yellow Page Group Corp. builds its own video ads. Meloy Dep. II at 118. She further testified that she could find no information on the video ads attached to the notice in the records available to her and did not make any further inquiry as to the source of the photos, notwithstanding that she knew who was making the video ads. Meloy Dep. II at 115-128. Treena Cooper, YPG's parent company's in-house counsel and Director of Legal Affairs from Canada, was also designated to testify on behalf of YPG. Likewise, she knew exactly who within the company to ask as to the source of the photos in these video ads, who she even referred to as "our Director of Digital Properties," in other words, not some individual who is unreachable as part of a so-called separate entity. Nevertheless, Ms. Cooper did not ask that individual about the source of photos and was unaware of any other efforts to do so. Cooper Dep. at 117-123. This was the case despite previous testimony of the two entities sharing systems and graphic files and despite YPG's obligation to put forth knowledgeable 30(b)(6) deponents.

Plaintiff believes at this point the photos made their way from Ziplocal to Yellow Pages Group Corp. through either YPG or Canpages. Either way, the inquiry ties back to Ziplocal's actions, which are the subject of this lawsuit.[10] There is simply no excuse for YPG's lack of knowledge on Plaintiff's photos appearing in Yellow Pages Group Corp.'s videos, particularly in

---

[10] On the subject of whether any search had been done to determine whether any of Plaintiff's photos were in YPG's system, Ms. Cooper knew only of a search by YPG's expert witness. Exhibit 18, Treena Cooper Sept. 25, 2013 Deposition Transcript at 49-57 ("Cooper Dep. I"). And when the question was posed as to whether any effort had been made to determine whether Canpages had received any of Plaintiff's photos from Ziplocal, Ms. Cooper claimed not to be aware of any effort having been made. Cooper Dep. I at 33-37.

light of YPG's previous opposition to Plaintiff's attempt to take the deposition of Yellow Pages Group Corp.  YPG has had examples of the videos containing Plaintiff's photos since at least last December, when Plaintiff attached them to its First Request for Production to YPG.  Plaintiff then again attached examples to the 30(b)(6) deposition notice for YPG.  YPG's 30(b)(6) representative, Ms. Cooper, works in Canada and is the Director of Legal Affairs.  It is difficult to comprehend how she would have no knowledge of Plaintiff's photos in Yellow Pages Group Corp.'s videos and how she would not have conducted an investigation into the same, particularly in light of YPG and Yellow Pages Group Corp.'s sharing of services, sharing of the very same system, and their "passing back and forth" of graphics.  It would seem that Ms. Cooper either does have knowledge of the photos, which would be contrary to her testimony, or has purposely not investigated the photos because she is well aware that the answer will be unfavorable for YPG.  Either way, this is inexcusable, and such willful blindness is unquestionably a violation of the discovery rules.  YPG's attempt to play this corporate shell game merely because Yellow Pages Group Corp. is technically a separate entity located in Canada cannot be condoned.  Either YPG needs to play it straight and provide the information on the photos or it needs to consent, and indeed at this point help arrange, Plaintiff's deposition of Yellow Pages Group Corp.  YPG cannot have it both ways.

**C.      YPG provided no answers regarding the source of the "YPPI DO NOT USE" folders located on its servers or their contents.**

Two mirror-image folders were discovered in YPG's system, supposedly during the search by YPG's expert, James Mercer, named "YPPI-DO NOT USE" that contained nearly 2,400 copies of Plaintiff's photos.  *See* Exhibit 19.  These folders were created in 2011 and 2012, in the time period Plaintiff first discussed the presence of its photos in YPG's systems with counsel for YPG and right before this litigation.  Yet when it came to providing answers about

the folders, YPG's 30(b)(6) designees claimed ignorance.  No one knew anything about them, where they resided, who created them, where the photos in them came from, or what happened to the stock photographic image library that YPG received from Volt.  Bialor Dep. at 93-99; Meloy Dep. I at 172-73 (by counsel's objections, someone at YPG knows this information); Meloy Dep. II at 168-71, 219-225 (counsel's explanation as to his client's lack of information).

**D.     Further documents were discovered by Plaintiff on the Ziplocal CorpX2 server, or had to be subpoenaed from Ziplocal's law firm, that the Court ordered Ziplocal to produce.**

At the August 22, 2013 hearing on Plaintiff's Renewed Motion to Compel, the Court ordered Ziplocal to produce additional documents on or before September 13, 2013:

- "any third-party agreements that it has with any other entity that's relevant to this case"
- "any additional e-mails"
- "a privilege log"

Dkt. 213 at 60-64.  Ziplocal failed on all counts.

A License Agreement with Art Explosion, one of YPG's other significant licensors of stock photographic imagery, was discovered by Plaintiff on the Ziplocal CorpX2 server.  *See* Exhibit 20.  This is the type of agreement Plaintiff specifically requested in discovery, and the Court ordered produced at both the May 20, 2013 and August 22, 2013 discovery hearings in this case, but was not, although a simple search apparently would have located it.

The three agreements with Canpages that Plaintiff specifically identified in its Renewed Motion to Compel were likewise not produced by the ordered deadline.  So Plaintiff subpoenaed the agreements from Ziplocal's law firm, Weil, Gotshal & Manges, LLP.  *See* Exhibit 21.  Those agreements were received from Weil Gotshal less than two weeks later by e-mail.  *See* Exhibit 22.  Yet Ziplocal could not get them and produce them from its own law firm over the preceding

three weeks?  Not surprisingly, the agreements shed a whole new light on how Plaintiff's photos may have made their way from Ziplocal to YPG's affiliates in Canada—through Canpages.

A mass of unproduced e-mails were found in the "YPPI_Legal" folder on the CorpX2 server, some of which are attached to this motion.  They are clearly relevant and responsive to discovery requests, yet were not produced.  Granted, some of them appeared they may have been privileged, and in an abundance of caution Plaintiff has had those e-mails quarantined and provided to counsel for Ziplocal for review.  Of those that appeared questionable, Plaintiff now has a subset to which counsel for Ziplocal did not object.

Finally, Ziplocal did not produce a privilege log prior to the Court-ordered deadline.  Yet when Plaintiff thereafter provided the above-referenced emails to counsel for Ziplocal, there were specific privilege objections.  This includes objections relative to pre-litigation emails, emails containing no attorneys, and emails that include third parties, although at the August 22, 2013 hearing Ziplocal represented it was not claiming privilege.  (Dkt. 213 at 43-46).  Notably, some of these emails reflect recipients at YPG, yet YPG has not produced or logged them either.

**E.      YPG is in possession of further copies of Plaintiff's photos it has not disclosed.**

In July, upon discovering that Canpages had ceased to exist and its business and assets had been folded into Yellow Pages Group Corp., Plaintiff wrote to counsel for YPG requesting return of the CDs upon which Plaintiff's photos had been provided to Canpages.  *See* Exhibit 23.  No response was received.  Later, in inquiring into whether Yellow Pages Group Corp. would consent to its corporate deposition being taken in preparation for moving for issuance of letters rogatory for the same, counsel would not clarify whether he was responding for both Yellow Pages Group Corp. and YPG, or just YPG.  *See* Exhibit 24.  Thereafter, at the hearing on the motion for issuance of letters rogatory, the Court even tried to elicit a response from counsel for

YPG as to whether he was also appearing for Yellow Pages Group Corp.  The response was ultimately "no," but counsel would not provide the Court with a direct answer as to whether Yellow Pages Group Corp. was even aware of the hearing.  (Dkt. 213 at 4-5).

As noted above, one of YPG's 30(b)(6) designees was the in-house counsel and Director of Legal Affairs of YPG's Canadian parent, Treena Cooper.  At deposition, when questioned as to the whereabouts of the CDs that had been provided to Canpages, Ms. Cooper knew right where they were—they had been furnished to Woodcock Washburn, counsel to YPG.  Cooper Dep. III at 169-71.[11]

YPG is playing a shell game among the Yellow Pages Group family of companies.  As a matter of convenience, there may be no boundaries or very rigid boundaries among the companies.  Irrespective, counsel to YPG is in possession of further copies of Plaintiff's photos that it did not disclose to its own expert, James Mercer, who supposedly conducted a search for all copies of Plaintiff's photos in YPG's possession, custody, or control, and has not supplemented its production as required by Rule 26(e) to produce the CDs or their contents.  The gamesmanship by YPG is remarkable, and has undermined Plaintiff's ability to complete its discovery and prepare its case for trial.

## III.    ARGUMENT

Pursuant to Rule 37, the Court may impose broad sanctions for discovery related abuses, and Rule 37 governs a party's failure to make a proper disclosure or cooperate in discovery.  *In re Seroquel Prods. Liab. Litig.*, 244 F.R.D. 650, 656 (M.D. Fla. 2007).  Rule 37 sanctions are imposed not only to prevent unfair prejudice to litigants but also to insure the integrity of the discovery process, and thus "the court is encouraged to consider whether the sanctioned party's

---

[11] The Court will note the number of objections and coaching of the witness by counsel for YPG in these few pages. These sorts of baseless objections and obstructive tactics have plagued the depositions in this matter.

conduct would cause 'other parties to…feel freer than…Rule 37 contemplates they should feel to flout other discovery orders of other District Courts.'" *Bray & Gillespie Mgmt., LLC v. Lexington Ins. Co.*, 2010 WL 55595, *2 (M.D. Fla. Jan. 5, 2010). Rule 37 provides sanction power to the court not only for failing to comply with a court order, but also for failing to properly respond to or supplement discovery responses. Incomplete responses are treated as a failure to respond, and bad faith is not required to sanction a party for discovery abuse. *In re Seroquel,* 244 F.R.D. at 656; *see also U & I Corp. v. Advanced Med. Design, Inc.*, 251 F.R.D. 667, 674 (M.D. Fla. 2008). As parties increasingly rely on electronic records, the number of potential discoverable documents has admittedly risen, but so too has the potential for discovery abuse. *In re Seroquel,* 244 F.R.D. at 653-54. In dealing with computer-based discovery, the responding parties "should be forthcoming and explicit in identifying what data are available from what sources…." *Id.* at 654.

Defendants' discovery abuse is sanctionable under Rule 37, since they failed to provide proper and complete discovery responses and documents, coupled with a failure to supplement. Along those lines, Defendants have not only purposely failed to provide responsive discovery, including the most relevant discovery pertaining to Plaintiff's photos, but in fact manipulated and moved responsive discovery around. As Plaintiff has now discovered, this was done in a very apparent and purposeful attempt to keep Plaintiff from obtaining some of the most relevant and important discovery in this case. This conduct has continued despite the fact that this case has been pending for well over a year, and Plaintiff has brought multiple motions to compel before the Court in unsuccessful attempts to bring an end to it.

In addition, at least Ziplocal has directly failed to comply with a court order under Rule 37(b), given that the Court directed it to turn over documents such as third party agreements and

emails by September 13, 2013, which it clearly did not do.  *See EscapesA, Inc. v. Legacy Land &*

*Dev., LLC*, 2011 WL 867250, *2 (S.D. Ala. March 14, 2011) ("[O]nce a party makes a prima

facie showing that the other party violated the court's discovery order, the non-moving party

must prove that it was impossible to comply in order to avoid sanctions."); *Broad. Music, Inc. v.*

*Bourbon Street Station, Inc*., 2010 WL 1141584, *2 (M.D. Fla. March 23, 2010) (same).  Given

the standards under Rule 37 for violation of a court order, and the apparent ease with which

Ziplocal could have provided the responsive documents had it made any real good faith attempt

to do so, there should be no question that Ziplocal is subject to sanctions.

However, even if the Court somehow finds that Defendants' conduct does not fit squarely

within Rule 37, the Court also has authority to impose sanctions within the court's "inherent

power to protect the orderly administration of justice and to preserve the dignity of the tribunal."

*See In re Amtrak "Sunset Limited" Train Crash*, 136 F. Supp. 2d 1251 (S.D. Ala. 2001)

(dismissing case as sanction); *see also Chambers v. Nasco, Inc.*, 501 U.S. 32, 43 (1991)

(affirming district court's imposition of sanctions, and stating that the court's powers to impose

sanctions are "governed not by rule or statute but by the control necessarily vested in courts to

manage their own affairs so as to achieve the orderly and expeditious disposition of cases");

*Cent. Fla. Council Boy Scouts of Am. v. Rasmussen*, 2009 WL 2781540, *5 (M.D. Fla. Aug. 28,

2009) (stating the court "possesses the inherent power to police its docket" and "may impose

formal sanctions upon dilatory litigants").

In *In re Seroquel*, the defendant was sanctioned for producing incomplete and insufficient

electronic records.  *In re Seroquel,* 244 F.R.D. at 657.  In that case, after the plaintiff filed a

motion to compel based on multiple issues with electronic discovery, the Court held an

evidentiary hearing and then allowed the parties to conduct conferences to hopefully work

together on complicated discovery issues. *Id.* However, when the defendant failed to live up to its commitments made in the parties' joint motion, the plaintiff moved for sanctions. *Id.* The court stated the following:

> Because the Court finds that Plaintiffs' previous Motion to Compel, and the Court's order setting the Evidentiary Hearing on the Motion gave AZ sufficient notice of the discovery conduct Plaintiffs were challenging and the possibility for sanctions if it was not resolved, the Court may sanction AZ for its conduct. AZ apparently relies on the fact that the Court had not granted Plaintiffs' Motion to Compel and ordered AZ to produce certain documents. That argument is disingenuous. The sole reason the Motion to Compel was not revisited and evidentiary hearing on its merits not held was because AZ agreed . . . that it would make corrections to the electronic discovery to make it accessible and searchable.

*Id.* Like in *In re Seroquel*, Plaintiff already brought a Motion to Compel against YPG and three Motions to Compel against Ziplocal, dealing in part with the issues of YPG failing to provide copies of Plaintiff's photos and ads containing them, as well as Ziplocal's failure to provide directories, emails, agreements, and other documents. At the hearing for the first motions to compel against both Defendants, YPG asserted that it had given Yellow Pages "everything," and Ziplocal asserted that it had produced documents and that more would be forthcoming. The Court reminded the parties to cooperate and directed the Defendants to continue to supplement with any responsive discovery. The mere fact that Defendants have verbally agreed to cooperate and claim to have provided all responsive discovery is obviously insufficient if they are not taking proper actions to comply with their discovery obligations, and now it has been shown that some of the most important and relevant documents have *knowingly* not been produced by the Defendants. *In re Seroquel*, 244 F.R.D. at 664-65 ("the Court finds that AZ has been 'purposely sluggish' in making effective production to Plaintiffs"). Defendants have been on notice of the deficiencies in their discovery responses, yet it seems every time Plaintiff forces their hands, more relevant discovery of which Defendants were well aware comes to light. Defendants

should be sanctioned by this Court.  *U & I Corp.*, 251 F.R.D. at 675 (sanctioning party in part for sporadic and incomplete document production as well as delay in advising other side on email production issues); *see also Chambers*, 501 U.S. at 45-46 (stating that a court may assess attorneys' fees against a party when it "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order").

Well over a year into this case, a copyright case centered on Plaintiff's photos and Ziplocal's transferring of them to YPG, Plaintiff is only now learning that Defendants' FTP production, represented by them to contain everything that Ziplocal transferred to YPG, very clearly does not contain everything, but rather is missing thousands and thousands of files.  Well over a year into this case, after being told numerous times that Plaintiff's photos were not transferred to YPG, Plaintiff continues to find more instances of its photos being provided to YPG on the CorpX2 server.  Well over a year into this case, after being told by the Defendants that they are unable to locate which ads contain Plaintiff's photos, Plaintiff (after reviewing hundreds of directories to locate ads containing the photos) finds out that in fact they have been locating them and changing out photos since the beginning of this case.  Well over a year into this case, after being told that Plaintiff has all ads containing its photos through the production of directories, Plaintiff finds out that there are hundreds more directories, as well as banner and box ads with its photos, that have not been produced.  Well over a year into this case, in direct contravention of this Court's order, Ziplocal failed to produce relevant third party agreements and emails, which Plaintiff is continuing to locate on the CorpX2 server on its own.  Well over a year into this case, Plaintiff still does not have answers as to how its photos are appearing in Yellow Pages Group Corp.'s videos or the "YPPI-DO NOT USE" folders.

Defendants' actions are clear attempts to hide the ball in this case and purposely block Plaintiff from receiving the relevant, material discovery.  Plaintiff has been able to discover this misconduct purely by conducting routine and basic searches of the CorpX2 server data.  There is absolutely no excuse.

## IV.    CONCLUSION

Given the length of time this conduct has been occurring, the depth of the misconduct, and the apparent blatant disregard for this Court's admonitions and orders, Plaintiff is entitled to the relief of sanctions.

WHEREFORE Plaintiff requests that the Court impose a sanction consisting of a formal finding, as permitted by Fed. R. Civ. P. 37(b)(2)(A), that it be taken as established for purposes of this action that (i) Ziplocal has transferred to YPG copies of all 10,411 of Plaintiff's photos at issue, (ii) YPG has copied the photos into its system for use in building ads, and (iii) YPG has in fact used the photos to build ads for Ziplocal and others.  *See, e.g.,* Rule 37(d)(3); (c)(1)(C); and (b)(2) (explaining sanctions that can include "directing that the matters…be taken as established for purposes of the action"); *see also Coquina Invs. v. Rothstein*, 2012 WL 3202273, *17 (S.D. Fla. Aug. 3, 2012) (same).  These are facts that Ziplocal has already conceded:

> *Plaintiff can establish through YPG's production that YPG has in its possession the Plaintiff's stock photographs and that those photographs came from Ziplocal.  This is the gravamen of Plaintiff's claim of copyright infringement...  (Dkt. 196 at 4)*

> *There's no real dispute in this case that we transferred things for YPG to use.*
> *(Dkt. 213 at 29)*

In addition, Plaintiff requests that the Court permit the deposition of Yellow Pages Group Corp. and direct YPG to cooperate in arranging it.  Plaintiff further requests attorneys' fees and costs incurred as a result of Defendants' discovery abuses.  Such relief is not only justified by the severity of Defendants' discovery misconduct, but is well-supported by the evidence.

Respectfully submitted,

/s/ J. Todd Timmerman
J. Todd Timmerman, Esquire
Florida Bar No. 0956058
ttimmerman@slk-law.com
Mindi M. Richter, Esquire
Florida Bar No. 0044827
mrichter@slk-law.com
Shumaker, Loop & Kendrick, LLP
101 East Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
Telephone No.: (813) 229-7600
Facsimile No.:  (813) 229-1660

Attorneys for Plaintiff, Yellow Pages Photos, Inc.

## CERTIFICATION UNDER LOCAL RULE 3.01(G)

Counsel for Yellow Pages and counsel for the Defendants have been unable to resolve the issues in this motion.

/s/ J. Todd Timmerman
Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 18, 2013, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send electronic filing to all counsel of record.

/s/ J. Todd Timmerman
J. Todd Timmerman, Esquire