--------------------------------------------------------- )
YELLOW PAGES PHOTOS, INC.,       )
      )
     **Plaintiff,**       )
**vs.**       )      **Case No.: 8:12-cv-755-RAL-EAJ**
      )
**ZIPLOCAL, LP AND YELLOW PAGES**       )
**GROUP, LLC,**       )
      )
     **Defendants.**       )
--------------------------------------------------------- )

## YELLOW PAGES GROUP, LLC'S RESPONSE IN OPPOSITION TO YELLOW PAGES PHOTOS, INC.'S MOTION FOR ENTRY OF PERMANENT INJUNCTION AND AWARD OF PREJUDGMENT INTEREST

## I.    INTRODUCTION

Plaintiff does not meet any of the prerequisites for entering a permanent injunction.  First, plaintiff cannot show any irreparable harm to its business because it long ago left the photo-licensing business in favor of the litigation business.  Plaintiff has sued many of its former customers, has expended not effort whatsoever into getting new customers since about 2009, and has clearly decided that litigation is much more lucrative than trying to license its outdated and anachronistic photos.  There are, in short, no "prospective customers" and no "market" that could conceivably be harmed at all, much less irreparably, if an injunction were not issued.  Indeed, plaintiff's principal testified just a few weeks ago that plaintiff's photos had already been made available to the world as early as 2009—long before the outsourcing arrangement between YPG and Ziplocal.

Secondly, Trent Moore admitted at trial that a damages remedy would compensate plaintiff.  Accordingly, plaintiff cannot show that injunctive relief is necessary.  As to the balance of hardships, YPG and Ziplocal ended their outsourcing arrangement early this year.  As such, there is no need for any order requiring YPG to destroy all copies of the photos.  Such an

order would just lead to incessant contempt motions by plaintiff—just as it filed numerous

discovery motions and sanctions motions during the discovery phase of this case. A permanent

injunction is a recipe for more mischief—which is surely not in the public interest.

## II. ARGUMENT

### A. The Motion for a Permanent Injunction Should Be Denied Because Plaintiff Cannot Meet Its Burden of Satisfying any of the Four Equitable Prerequisites and Because of Plaintiff's Unclean Hands

#### 1. The Four Requirements That Must Be Satisfied Before a Permanent Injunction May Issue

A permanent injunction may not be automatically imposed upon a jury verdict of

infringement. *eBay, Inc. v. Mercexchange*, LLC, 547 U.S. 388, 392-93 (2006). In *eBay*, the

Court held that the "traditional four-factor framework that governs the award of injunctive relief"

must be applied. *Id*. at 394. Although *eBay* was a patent case, the Court's holding has been

applied to copyright cases as well. *Axiom Worldwide, Inc. v. HTRD Group Hong Kong Ltd*.,

2013 U.S. Dist. LEXIS 77650, at *75-78 (M.D. Fla. June 1, 2013); *Peter Letterese & Assocs.,

Inc. v. World Inst. of Scientology Enters. Int'l*, 533 F.3d 1287, 1323 (11th Cir. 2008). Under

*eBay*, the plaintiff must prove "(1) irreparable injury, '(2) that remedies available at law, such as

monetary damages, are inadequate to compensate for that injury; (3) that, considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is warranted, and

(4) that the public interest would not be disserved by a permanent injunction.'" *Axiom

Worldwide*, 2013 U.S. Dist. LEXIS 77650 at *75-76 (quoting *eBay*, 547 U.S. at 391); *Peter

Letterese*, 533 F.3d at 1323. Plaintiff cannot meet its burden of proof as to any of these factors.

#### 2. Plaintiff Has Offered no Evidence That It Would Suffer Irreparable Harm if an Injunction Did not Issue

##### a. Plaintiff Has no Market or Potential Customers That Could Even Arguably Be Affected by YPG

### (1) Plaintiff Exited the Photo-Licensing Business in Favor of the Litigation Business in 2008

Plaintiff argues that if a permanent injunction were not granted, it could lose "potential customers" and it would harm its "potential market." YPPI Mot. at p. 10. But plaintiff has no "potential customers" or "potential market." By 2008 or 2009, plaintiff had abandoned the photo-licensing business in favor of a business model of suing its current and former licensees. Plaintiff has entered into no new license agreements with anyone for at least 5 years, and has not issued a single invoice for licensing of its photos in 4 years. YPPI Trial Ex. 61, Ex. 1.[1] None of this is surprising: First, the business of litigation has been vastly more profitable for plaintiff than the business of licensing stock photos ever was. Second, it is hardly remarkable that the very few remaining players that have survived in the yellow pages market and that have not already been sued by the plaintiff would not want to do business with it.

During discovery, plaintiff produced its financial statements for the years 2002 through 2012. Those statements paint a clear picture. In 2002 (the first year for which financial statements were produced, plaintiff had total revenue of ███████, of which about ███████ was from licensing ███████ was for consulting). Plaintiff had expenses of ███████, yielding net income of ███. 2002 Income Statement, Ex. 3. In 2003, revenues increased to ███████ (of which about ███████ was from licensing) and expenses also increased, to $252,812, for net income of ███. 2003 Income Statement, Ex. 4. Licensing revenue increased to about 397,000 in 2004, and increased again in 2005 to about ███████, but then it dropped substantially in 2006 to about ███████, with expenses increasing to ███████ for net income of ███. 2004 Income Statement, Ex. 5; 2005 Income Statement, Ex. 6; 2006 Income

---

[1] Plaintiff's principal, Trent Moore, testified at trial in March 2014 that YPPI Trial Exhibit 61 contains all of the company's available records regarding its licensing and payments thereunder, except for documents missing or lost. March 18, 2014 Trial Tr., Ex. 2 at 241:18-243:5 (Moore) (Ex. 61 is the company's complete books and records with respect to its license agreements and payments thereunder).

Statement, Ex. 7.  In 2007, plaintiff did a bit better, with licensing revenue of about ████

and net income of ████ (2007 Income Statement, Ex. 8) but in 2008, licensing revenue

plummeted to about $████, with expenses at ████ and net income of ████ (2008

Income Statement, Ex. 9).  The writing was on the wall:  to make serious money, the business

model needed to change.  So instead of trying to attract licensees with a better product, plaintiff

began suing its customers.

The change in business strategy worked.  On May 13, 2008—the same year that licensing

revenue had plunged--plaintiff sued its licensee Yellow Book USA, Inc.  Docket in *YPPI v.*

*Yellow Book USA et al.*, Ex. 10.  The case settled in November 2009, after plaintiff filed a

motion for sanctions that, if granted, would have required the defendants to manually review

directories for plaintiff's photos.  *Id*. at Docket Nos. 111, 112, 113.  Because of that settlement,

in 2009, plaintiff enjoyed net income of ████.  2009 Income Statement, Ex. 11. This was

over ██ times the net income plaintiff had earned for the years 2002 through 2008 combined.

And the revenues of ████—of which all but ████ was from settlement of the litigation

against Yellow Book—represented substantially more than the cumulative total of $1,663,000 in

revenue for the *combined years 2002 through 2008*.

In 2010, plaintiff sued its licensee User-Friendly Phone Book.  Docket for *YPPI v. User-*

*Friendly Phone Book et al.*, Ex. 12.  That case settled in August 2011.  *Id.* at Docket No. 183.

Plaintiff received ████ in settlement, and earned net revenue of $409,530 for 2011, with

litigation expenses of over ████.  2011 Income Statement, Ex. 13.  Not surprisingly, during

2011, plaintiff did not sell or license a single photo.  *Id.; see also* YPPI Trial Ex. 61, Ex. 1.

Then, in 2012, plaintiff also failed to earn one penny from licensing, but instead of attempting to

improve its sales efforts, its largest expense was the ███████ it spent on legal fees. 2012 Income Statement, Ex. 14.[2,3]

The two settlements exceeded ███████ in revenue for YPPI—about 2 ½ times plaintiff's cumulative revenues from licensing for all the years it has been in business. And the ███ million in net revenue plaintiff earned on account of the two settlements was about █ times the total net revenue plaintiff had previously earned from licensing stock photos.

### (2) Plaintiff's Misleading Trial Testimony

At trial, plaintiff's counsel and Mr. Moore used the present tense repeatedly to describe the status of plaintiff's licensing business. March 17, 2014 Trial Tr., Ex. 15 at 7:6-21 ("Yellow Pages Photos, Inc. *is* a provider of stock photography. That *is* all they do. They *license* photography to people who need photographs. They *sell* licenses to directory publishers from large to small. . . . AT&T *is* a client. Verizon Directories *is* a client. He *has* licenses with all these companies") (emphasis supplied); 8:5-8 ("They get – the *new customers* get a license to use. If you use the photos, you have to be licensed to use them. That's the business model, and that's *how this company makes money*.") (emphasis supplied); 10:14-19 ("Mr. Moore will tell you generally he only licenses to the publishers that sell to the people who are buying ads in the – in the directory. And he will also tell you about how he *goes* about protecting his market, *includes* restrictions and all these license agreements on use and transferability.") (emphasis supplied); *id.* at 11:8-9 ("Now, this *is* that company's only product. They don't have another product.") (emphasis supplied); March 18, 2014 Trial Tr., Ex. 2 at 241:15-17 (Moore: YPPI currently has 70-80 licensees); *id.* at 109:24-25 (same).

Mr. Moore told the jury that he is continuing to market and take pictures, even

---

[2] The legal expense line has the code 52103. In earlier years, the code's description appears. So, for example, in the 2005 income statement, one can see on the third page that the code "52103 is for "legal."
[3] Plaintiff has refused to produce its financials for 2013.

purchasing a new camera for the company. March 17, 2014 Trial Tr., Ex. 15 at 69:14-16 (Moore) ("Today I use a Hasselblad H30II."); id. at 71:8-11 ("How would you describe yourself as a marketer? A. How would I describe myself in the market? Q. Yeah. A. Little fish in a big sea, but it's fun."); *id.* at 73:2-5 (Moore) ("I create images. I edit the images myself, market, sell, production shipping."). But, Mr. Moore also admitted that his entire library consisted of the 10,411 photos YPPI licensed to it—the last photo of which was delivered to Ziplocal in 2009. *Id.* at 79:3-5 (YPPI Trial Ex. 80 is all of YPPI's images); *id.* at 82:9-13 (entire library of 10,411 images was licensed to Ziplocal). Mr. Moore failed to explain why his library has not grown in 5 years if he is still creating and editing the pictures.

At trial, Mr. Moore also testified about allegedly current negotiations with potential licensees. In particular, he described negotiations with Yellow Book, AT&T, the Association of Directory Publishers, and Verizon. March 18, 2014 Trial. Tr., Ex. 2 at 13:7-17 ("Recently I've been in lengthy discussions with Hibu, which is now Yellow Book, about a different type of delivery platform. The Association of Directory Publishers[--]we[']re in discussions now to create something for all of the publishers versus a single publisher. And I've been in discussions with AT&T regarding their outsource arrangement and their desire to use my images that they have purchased for their outsourcing."); March 17, 2014 Trial Tr., Ex. 15 at 109:22-23 ("The largest [publisher YPPI has licensed to] would be for now AT&T. Shortly it will be Verizon.").

It is unclear what sort of negotiations Mr. Moore would be conducting with Yellow Book. As noted, plaintiff sued Yellow Book in 2008, and settled with it in 2009. Complaint in *YPPI v. Yellow Book & Pindar Set*, No. 8:08-cv-00930-EAJ, Ex. 16. Despite representing during discovery that all licensing records had been produced, plaintiff has never produced any documentation relating to any such negotiations, and when YPG's counsel recently asked for any

corroborating documents in connection with its claim in its motion for permanent injunction that it has "potential licensees," plaintiff's counsel refused. May 23, 2014 email from D. Wolfsohn to T. Timmerman, Ex. 17; May 27, 2014 email from T. Timmerman to D. Wolfsohn, Ex. 18.

Mr. Moore's testimony that Verizon would "shortly" be his largest customer is even more troubling. Verizon spun off its phone directories business to Idearc in 2006. http://en.wikipedia.org/wiki/SuperMedia Idearc filed a Chapter 11 petition in 2009 and emerged as SuperMedia, LLC. Oct. 9, 2013 Mem. Op. in *In re SuperMedia, Inc*., D. Del. Bankruptcy, Docket No. 280, Ex. 19 at p. 3. In 2011 YPPI sent SuperMedia a letter claiming that it had breached its license agreement by transferring images to a third party. SuperMedia responded that the third party was a contractor, and that transfer of images was permitted under the agreement. *Id.* at p. 3. On March 18, 2013, SuperMedia filed a prepackaged bankruptcy in bankruptcy court in the District of Delaware. *Id.* Shortly after the trial in this case, plaintiff appeared at a trial in Delaware bankruptcy court in the liability phase of its claim that SuperMedia breached its contract and infringed its copyrights. YPPI Post-Trial Br., Ex. 20 at p. 1. It is unclear how YPPI's pending claim for breach of contract and copyright infringement against SuperMedia could possibly result in Verizon "shortly" becoming YPPI's largest customer. Again, plaintiff gave the impression to the jury that it has customers interested in its product and was conducting negotiations with them, when the truth is that the only "licensing" YPPI conducts is in settlement of the litigations it has filed against its customers.

YPG's counsel asked plaintiff's counsel for corroborations of all of these supposed negotiations, but plaintiff's counsel refused. May 23, 2014 email from D. Wolfsohn to T. Timmerman, Ex. 17; May 27, 2014 email from T. Timmerman to D. Wolfsohn, Ex. 18. YPG also asked for plaintiff's 2013 income statement, and documents that would support plaintiff's

contention in its request for a permanent injunction that it still has a licensing business, still has customers, and still has potential customers. To date, plaintiff has refused to back up these claims with a single document. Plaintiff's refusal to corroborate Mr. Moore's testimony raises a compelling inference that plaintiff's contention that it has any market or any potential licensees is completely without merit.[4]

**(3)    Plaintiff Has Offered no Proof That It Has any "Potential Customers" and Its Theory of Irreparable Harm Makes no Sense**

Plaintiff argues in its motion that its "market" would be harmed if a permanent injunction were not granted. YPPI Mot. at pp. 9-10. It alludes to loss of "potential customers" and possible destruction of its "potential market." *Id.* at 10. But, as shown above, plaintiff has no market: It has presented no proof that it has any current customers, much less any potential customers. Its business for 5 or 6 years has been suing its customers. It has not even had a web site for many years. March 18, 2014 Trial Tr., Ex. 2 at 232:25-233:9 (Moore) (no website for at least 2 years) As such, plaintiff is not a participant in any market that could be harmed—much less irreparably.

Moreover, the testimony from Mr. Moore upon which plaintiff relies in its motion makes no sense. Plaintiff's motion relies upon Mr. Moore's testimony at trial that YPPI had been damaged because "[e]ach company that receives these images and is allowed to use them to their benefit without paying my company denies me of any ability to make income." March 18, 2014 Trial Tr., Ex. 2 at 145:20-146:21. Since we know that plaintiff has made virtually no income from licensing for 5 years, that is a misleading statement at best. In addition, the fact that YPG received plaintiff's photos and used them for Ziplocal's publications did not and could not logically have any impact on the market for plaintiff's photos. Even if there were "potential

---

[4] In the event that the Court intends to hold a hearing on plaintiff's motion, YPG requests that the Court order plaintiff to produce the documents requested in the May 23, 2014 email from YPG's counsel to plaintiff's counsel prior to any such hearing

customers," they would not know or care whether Ziplocal's ad production and pagination was being done in-house or by YPG.  And even if the potential customer did know that YPG was helping Ziplocal, that knowledge would have no impact on the desirability of plaintiff's photos or the price the customer would be willing to pay for them.  It is undisputed that YPG only used the photos in connection with Ziplocal's publications, and there is no evidence that any publisher, much less a potential customer of YPPI's, ever received any photos from YPG.  *Id.* at 226:20-23 (agreeing that YPPI's photos have been used in only Ziplocal's products); March 24, 2014 Trial Tr., Ex. 21 at 197:5-16 (Meloy) (photos were only used for Ziplocal's publications). The use by YPG of plaintiff's photos, therefore, could not possibly affect the decision of a potential customer to purchase the photos, which is why plaintiff presented no evidence at trial of any loss of potential licensees.

Moreover, under the SLPA and even the EULA, Ziplocal was entitled to publish plaintiff's photos an unlimited number of times in an unlimited number of directories for an unlimited number of years.  Ziplocal therefore had the right to use plaintiff's photos for every one of its ads in every one of its books until the end of time.  Instead, Ziplocal's use of YPG resulted in the photos' being used less than they otherwise would have, since it is undisputed that YPG's only source for stock photography for new ads was Getty Images.  *Id.* at 185:3-8.  In addition, Ziplocal have removed thousands of those photos from Ziplocal's books.  March 24, 2014 Trial Tr., Ex. 21 at 210:3-211:4 (Meloy).  Plaintiff's photos have therefore been used much less than they would have been had the outsourcing not occurred.  Under plaintiff's theory that greater dissemination leads to lesser demand, the converse should be true:  less dissemination would lead to greater demand.  Yet plaintiff's financials show that either YPPI or the market or both are completely uninterested in licensing YPPI's photos.

b. **Even if Plaintiff had Made a Showing That it Has a Market That Could Potentially Be Harmed, the Outsourcing Arrangement Between Ziplocal and YPG Terminated in January 2014 so There Will Be no Further Use of Plaintiff's Photos by YPG**

At trial, Michelle Meloy testified—in unrebutted testimony—that the outsourcing agreement had been terminated and that YPG was no longer providing any ad building, or any other, services to Ziplocal. March 24, 2014 Trial Tr., Ex. 21 at 200:25-201:7; *see also* Amendment to Outsourcing Agreement, [YPG trial Exhibit 122] Ex. 22. As noted, Mr. Moore admitted that the only use by YPG of plaintiff's photos was in connection with Ziplocal's publications. March 18, Trial Tr., Ex. 2 at 226:20-23 (agreeing that YPPI's photos have been used in only Ziplocal's products); March 24, 2014 Trial Tr., Ex. 21 at 197:5-16 (Meloy) (photos were only used for Ziplocal's publications). YPG does not publish its own phone books. March 24, 2014 Trial Tr., Ex. 21 at 179:14-25. Accordingly, there is no possibility that plaintiff's photos will be used by YPG in any publications.

Plaintiff argues that YPG "is a demonstrated recidivist infringer, and a willful infringer at that." YPPI Mot. at pp. 9-10. Based on this faulty premise, plaintiff argues that, without an injunction, YPG will not "stop using" plaintiff's photos. *Id.* at p. 9. This assertion is completely belied by the record. First, again, the only use YPG made of plaintiff's photos was for Ziplocal's publications. That relationship has ended, so there would be no occasion for YPG to use plaintiff's photos. YPG spends hundreds of thousands of dollars each year for its license to Getty's images—a license that Ms. Meloy demonstrated at trial provides YPG with a vast collection of up-to-date photos for every conceivable publishing need. *See* March 24, 2014 Trial Tr., Ex. 21 at 205:9-210:1.

Secondly, YPG was (and is) licensed to the 1195 photos that it received via the Volt transaction, and this Court has ruled that Ziplocal was permitted to outsource to YPG under the

Site License Purchase Agreement. Thus, YPG never disregarded any of plaintiff's copyright rights.

YPG recognizes that the jury found that YPG was a willful infringer, but that finding is erroneous as a matter of law. A finding of "willfulness" requires evidence that the defendants acted "'with knowledge that the defendants' conduct constitutes copyright infringement.'" *MCA Television LTD v. Feltner*, 89 F.3d 766, 768 (11th Cir. 1996) (quoting 3 *Nimmer on Copyright* § 14.04[B][3][a], 14-77); March 26, 2014 Trial Tr., Ex. 23 at 109:10-12 ("Infringement is willful if plaintiff proves that one or both defendants knew that their actions constituted infringement of plaintiff's copyright."). Where a defendant is unaware that its actions are infringing the plaintiff's copyrights, there can be no finding of willfulness. *Axiom Worldwide, Inc. v. HTRD Group Hong Kong Ltd.*, 2013 U.S. Dist. LEXIS 107322, *27-28 (M.D. Fla. July 31, 2013) (no finding of willfulness where defendant reasonably believed third party owned plaintiff's software).

It was uncontested that outsourcing is common in this industry. March 20, 2014 Trial Tr., Ex. 24 at 169:7-18 (Cooper) (outsourcing common in industry; would never think due diligence necessary in situation in which "we're literally walking into the shoes of another person and just doing certain tasks"); March 24, 2014 Trial Tr., Ex. 21 at 176:25-178:7 (Meloy) (outsourcing common; unflattened files with images are commonly transferred to third parties for outsourcing). Indeed, this Court has adopted the rule in *Automation by Design* that licensed uses may be delegated to subcontractors and so forth. Also, under the Outsourcing Agreement, Ziplocal agreed that the work being done by YPG would not infringe any third-party's rights. March 20, 2014 Trial Tr., Ex. 24 at 167:25-68:14; Jt. Trial Ex. 27, Ex. 25. Under these facts,

YPG had no reason to believe—much less to *know*--that its outsourcing for Ziplocal violated any copyright owner's license.

Plaintiff presented no evidence that YPG knew its actions in helping Ziplocal with ad production constituted infringement of plaintiff's copyrights. It is undisputed that YPG did not know that YPPI's photos were among the ads. March 24, 2014 Trial Tr., Ex. 21 at 197:17-24. The photos did not have a copyright notice on them, or otherwise contain any information from which one could identify them. *Id.* Even Mr. Moore, who had taken many of the photos himself, had great difficulty identifying them; indeed, he testified that it took him many months and thousands of hours to identify his photos by comparing them with his master set, and he was working on that right up until the time of trial. March 18, 2014 Trial Tr., Ex. 2 at 117:2-19; *id*. at 124:12-16. There was therefore nothing in the mass of ad files received from Ziplocal, or anywhere else, from which a jury could conclude that YPG knew about the EULA's prohibition against "transfer" or nonemployee "users."

Even if YPG had become aware that some of plaintiff's photos were among the millions transferred files, for its actions to be considered willful, it would have to have known that the terms of a license between Ziplocal and YPPI prohibited the outsourcing of pagination and ad building. The Court has held that outsourcing was *permitted* under the SLPA and that, without a prohibition on outsourcing, YPG did not infringe. This means that, for YPG's conduct to be considered willful, there had to be evidence in the trial record that YPG knew about the *EULA and knew that it trumped the SLPA.* There was no such evidence. Indeed, the record on just what were the terms of the license are such a muddle—even after a trial—that it is inconceivable that YPG can be charged with such knowledge before the lawsuit. Even the plaintiff has taken inconsistent positions about what the licensing terms are between plaintiff and Ziplocal. In this

litigation, plaintiff has argued that there are two agreements that were part of "one transaction"—the EULA and the SLPA. But when plaintiff's counsel wrote to Treena Cooper in 2012, he took the position that only the EULA—the very document that Mr. Moore said "is not the contract"—contained the parties' licensing terms. March 20, 2014 Trial Tr., Ex. 24 at 160:24-161:16; Ziplocal Trial Ex. 8B, Ex. 26. Likewise, Ziplocal thought that the governing license agreement was the SLPA, not the EULA. March 24, 2014 Trial Tr., Ex. 21 at 120:18-121:19.

Moreover, Moore and Woodall argued that the EULA contained "mistakes" or "typos," and they further claimed that neither of them had read it carefully, with neither of them noticing the "mistakes" and "typos." Mr. Moore also admitted that the prohibition on "transfer" to third parties had exceptions—such as to printers and paginators—exceptions that are nowhere to be found in the express terms of the EULA. March 18, 2014 Trial Tr., Ex. 2 at 22:21-23:23. It is not reasonable to ascribe to YPG the "knowledge" that an unsigned, undated document riddled with "mistakes" and "typos," about whose meaning the signatories disagree, and that is inconsistent with the SLPA somehow prohibited a standard industry practice. In short, this is about as far from a case of willfulness as one can imagine. As a matter of law, there was no willfulness on YPG's part.[5] In short, there was no evidence that YPG ever used plaintiff's

---

[5] YPPI argues that the fact that Mr. Moore contacted YPG before YPG contacted Mr. Moore about the photographs purchased from Volt. YPPI Mot. at p. 8. That is not evidence of anything, much less copyright infringement. Mr. Moore contacted YPG immediately after the Volt transaction closed. JTX 11, Ex. 27 ("I would like to congratulate you and Yellow Pages Group on your recent acquisition of Volt Sciences Directory systems and publishing operations."). Indeed, YPPI had billed Volt for photos as late as July 2008—right before Mr. Moore sent his first letter to YPG in September 2008. Ex. 28, YPG74 at YPPI_zip 011304. There is no evidence that any of those photos were "reproduced" by YPG before Mr. Moore sent his letter. Moreover, Mr. Moore, in his letter to YPG's CEO, not only never suggested that use by YPG of the Volt images would be a breach but, to the contrary, stated that YPG would only have to pay to the extent that the number of artists exceeded the number licensed under the Volt agreement. JTX 11, Ex. 27 ("As I am sure you are aware, images are licensed based upon the number of users across an enterprise, so we would need a new count of artist[s] in the new enterprise to calculate a new license fee for the images (less what we have already been paid by Volt)."
Plaintiff also argues that when, in 2008, someone at YPG copied a picture of a water heater out of another publisher's book, that was "blatant copyright infringement." YPPI Mot. at p. 9. But copies of useful articles such as water heaters are not copyrightable, and certainly Mr. Moore acquired no rights to his copy of a manufacturer's product. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1234 (11th Cir. 2010 (motorcycles shown in plaintiff's

photos other than because Ziplocal had already put them in ads—ads for which Ziplocal had every right to use those photos. Now that the relationship between Ziplocal and YPG is over, there is even less need for an injunction.

### 3. Mr. Moore Admitted That a Monetary Award Would Compensate Plaintiff Adequately

One of the requirements that plaintiff must prove is that remedies available at law, such as monetary damages, are inadequate to compensate for that injury. Plaintiff mentions this requirement in passing in stating the standard, but then completely ignores it. YPPI's Mot. at p. 4. The reason for this omission is that Mr. Moore admitted, on questioning from his own counsel, that monetary damages would be adequate:

> Q. Would a monetary award fully compensate you for your damages in this case?
>
> A. I believe so, yes.
>
> Q. Would it recapture the market you've lost?
>
> A. Possibly.

March 18, 2014 Tr., Ex. 2 at 153:14-18.

> Q. Now, if the images were to remain out in the marketplace uncontrolled, would you suffer harm?
>
> A. Yes, I would.
>
> Q. Would you be able to put a dollar value on that?
>
> A. No.
>
> Q. Would a monetary award in this case solve that problem?
>
> A. Yes, it would.
>
> Q. How would that be?

---

photos were not protected by copyright laws; "useful articles" such as motorcycles are "not subject to copyright protection"); *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.,* 528 F.3d 1258, 1268-69 (10th Cir. 2009) (no protection for plaintiff's digital models of Toyota where purpose of model was to accurately portray Toyota designs). Moreover, at trial, Mr. Moore said such copying was completely acceptable. March 18, 2014 Trial Tr., Ex. 2 at 22:21-24:13.

A. Well, I believe that through the consideration of the damage done to the market and some punitive measure, that that would compensate me.

March 18, 2014 Tr., Ex. 2 at 155:6-17.

Accordingly, on this ground alone, plaintiff's request for a permanent injunction should be denied.

### 4. The Balance of Hardships and Public Interest Weight Against Granting YPPI's Motion

Plaintiff is correct that YPG has no need for plaintiff's photos. Indeed, it never did have any such need given its licensing agreement with Getty that was first entered into in 2009. Joint Trial Ex. 10, Ex. 29, at YPGLLC104706 (Extension Amendment to Getty Images' Premium Access License Agreement). That is why the photos were never used by YPG other than in Ziplocal publications. And since YPG's outsourcing arrangement with Ziplocal ended months ago, YPG has not and will not access, process, or paginate any of the ad files or images within them that were received from Ziplocal back in 2011. The Court may well wonder, therefore, why YPG is opposing plaintiff's request for a permanent injunction.

The answer is that plaintiff's request is a trap. This is the same trap that plaintiff has used in other litigations, and that it tried to set in this case. The trap is to obtain a court order that all copies of any of plaintiff's photos must be identified and purged by the defendant. Knowing that that is unfeasible both because (as Mr. Moore emphasized) it is difficult to identify the bits and pieces of Mr. Moore's photos that appear in ads and because there is no electronic way of searching for those photos, plaintiff wants to create a situation in which it can cry "Gotcha!"— just as it was hoping it could do in discovery. By laying such a trap, plaintiff hopes to obtain leverage for a settlement, or to try and obtain contempt sanctions. In other words, plaintiff is looking for a means of repeatedly coming back to this Court with arguments such as those made in the past: That every ad it sees in, say, Canada containing one of its images must have come

from YPG because there supposedly is no other source; or, that YPG has not destroyed every last copy of YPPI's photos because there is some ad it finds somewhere containing one of its images. In short, if this permanent injunction were granted, plaintiff would be running into Court as often as it did during discovery—claiming that not every copy of every photo was purged, and demanding discovery, hearings, and sanctions.

At the same time, trying to seek out every copy of one of plaintiff's photos on YPG's systems would likely require hiring a computer forensic expert, and entail significant business interruption and other costs. But since plaintiff has admitted there is no digital means of finding plaintiff's photos, the expenses incurred to conduct that search would accomplish nothing.

Plaintiff has already been paid $364,000 for a permanent license with Ziplocal that this Court concluded permitted outsourcing. Plaintiff has also been paid $6,000 by YPG for a permanent right to "continue to use" the 1195 photos received from Volt. And plaintiff has been awarded $223,000 by the jury that compensated plaintiff for any damage done to its "market" because of the infringement. Even though YPG has the right to continue to use the 1195 photos, it will not be using them for practical reasons, if for nothing else. If plaintiff really believes that YPG has infringed YPPI's copyrights, it will always have the option of filing another lawsuit—consistent with its obligations under Fed. R. Civ. P. 11. Short of that, it is not in the public interest for this Court to have to preside over the inevitable motions for contempt and sanctions that YPPI would surely be filing if the Court were to grant this motion.

### B. Plaintiff's Request for Prejudgment Interest Should Be Denied

#### 1. Prejudgment Interest Is Unwarranted Because of the Nature of the Jury's Award

Plaintiff argues that it should be awarded prejudgment interest "in order to fully compensate" it. YPPI Mot. at p. 12. It argues that the jury's award of statutory damages against

YPG were for "lost licensing revenue." *Id.* at p. 14. The jury was asked to assess the harm to plaintiff *at the time of their deliberations*. Plaintiff's counsel argued in his closing that the statutory damages awarded should be, at least in part, to "deter[] future infringement." March 26, 2014 Trial Tr., Ex. 23 at 37:3-6. There is no evidence that the jury was assessing damages for some earlier period of time; to the contrary, plaintiff argued that it had lost "licensing revenue," but it never specified when that licensing revenue would have been earned. Accordingly, this is not a case in which prejudgment interest is appropriate in order to make the plaintiff whole.

Plaintiff's authorities prove this point. In *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 718 (9th Cir. 2004), the Ninth Circuit held that "prejudgment interest may be necessary at times to effectuate the legislative purpose of making copyright holders whole and removing incentives for copyright infringement . . . ." In particular, the court noted that prejudgment interest "may be necessary to discourage needless delay and compensate the copyright holder for the time it is deprived of lost profits or license fees." *Id.* But plaintiff did not obtain any award of lost profits or even actual profits against YPG. Because the only award was statutory damages, there is no support for the notion that the jury was basing its award upon some theoretical lost revenue that took place years before the jury's verdict.

Likewise, in *William A. Graham Co. v. Haughey*, 646 F.3d 138 (3d Cir. 2011), the Third Circuit held that the district court had acted within its discretion in awarding prejudgment interest where the damages awarded were in the form of the defendants' profits. 646 F.3d at 141, 151. The profits earned by the defendants dated back to 1992, but the jury's verdict was rendered in 2006. *Id.* at 141, 142. The Third Circuit held that permitting the court to exercise discretion to award prejudgment interest on an infringer-profits award made sense so that the

defendants would not "retain the money's time value as a windfall in the form of an interest-free loan." *Id*. at 145. That rationale does not apply where, where the award was not for infringer's profits under 17 U.S.C. § 504(b), and where the jury was told to assess statutory damages at the time of their deliberations, not as of some earlier period of time. *See also Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1040-41 (10th Cir. 1990) (holding that district court had the discretion to award prejudgment interest where damages were infringer profits, not statutory damages).

Moreover, plaintiff assumes that the infringement all took place in 2010—when Ziplocal and YPG signed the Outsourcing Agreement. YPPI Mot. at p. 15. But the execution of the Outsourcing Agreement is irrelevant to when the infringements took place, and even more irrelevant to fixing the time when any infringements would have supposedly caused plaintiff any harm. YPPI's Exhibit 84 contained the copies of the ads that plaintiff contended contained YPPI images. Those ads had various dates, some from 2010, but some even from 2014. Even if prejudgment interest were appropriate here, plaintiff should have accounted for when the infringement took place and then adjusted the calculation of prejudgment interest accordingly. For example, to the extent the jury's award could be said to be attributable to infringement that took place in 2014, obviously YPG should not have to pay interest going back to 2010 on such amount. *See William A. Graham Co. v. Haughey*, 2008 U.S. Dist. LEXIS 26396, at * 10-11 (E.D. Pa. April 2, 2008) (approving of plaintiff expert's methodology where he calculated prejudgment interest depending on when the profits were earned so that, e.g., profits earned in 2005 only began earning interest in 2005).

Finally, plaintiff's proposed interest rate is much too high, and it would result in a huge windfall for the plaintiff. Plaintiff asks for the Florida statutory rate, which was 4.75% and 6%

depending on the time period. Because of the low-interest-rate environment over the last few years, awarding such a rate to plaintiff would overcompensate it. Numerous courts have held that the appropriate rate is the 52-week Treasury bill rate; indeed, this is the rate at which postjudgment interest is awarded. 28 U.S.C. § 1961(a). Even several of plaintiff's own authorities state that the 52-week T-bill rate is usually the most appropriate one. *William A. Graham Co. v. Haughey*, 2010 U.S. Dist. LEXIS 47035, at * 11-12 (E.D. Pa. May 12, 2010) (approving of one-year constant maturity Treasury bill), *aff'd, William A. Graham Co.*, 646 F.3d at 141; *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1552 (9th Cir. 1989) (holding that district court's prejudgment interest award "should be based on the fifty-two week Treasury bill rate, unless the district court concludes that the equities demand a different rate."); *see also Bourne Co. v. Walt Disney Co.*, 1994 U.S. Dist. LEXIS 7783, at * 7-8 (S.D.N.Y. June 10, 1994) (applying 52-week Treasury rate); *EMI April Music Inc. v. 4MM Games, LLC*, 2014 U.S. Dist. LEXIS 11448, at *30-31 (S.D.N.Y. Jan. 13, 2014) (same); *King Records, Inc. v. Daily*, 2003 U.S. Dist. LEXIS 27285, at *32-33 (M.D. Tenn. Sept. 22, 2003) (same*); Softel, Inc. v. Dragon Med. & Scientific Communs. Ltd.*, 891 F. Supp. 935, 944 (S.D.N.Y. 1995) (same). *See also Kleir Advertising*, 921 F.2d at 1042 n. 4 (noting that either the prime rate or the 52-week T-bill rate could be applied in the court's discretion).

The 52-week T-bill rate was .27% on January 3, 2011; .11% on January 3, 2012; .14% on January 2, 2013; and .12% on January 2, 2014. http://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=billRatesYear&year=2014 Based on these rates, and assuming counterfactually that the entire award of $123,000 represented damages from infringement in 2011, the total award of prejudgment interest, if the Court decides to award it,

would be $676.[6]

## III.    CONCLUSION

For the foregoing reasons, YPG respectfully requests that the Court deny plaintiff's

motion for a permanent injunction and for prejudgment interest.

June 9, 2014                                     Respectfully submitted,

C. Douglas McDonald (FBN 296538)                /s/ David J. Wolfsohn
CARLTON FIELDS JORDEN BURT                      David J. Wolfsohn (Pro Hac Vice)
4221 W. Boy Scout Blvd., Ste. 1000              Jeffrey S. Pollack (Pro Hac Vice)
Tampa, Florida  33607-5780                      Duane Morris LLP
                                                30 South 17th Street
                                                Philadelphia, PA 19103
                                                Telephone: 215-979-1866
                                                Facsimile: 215-979-1020

                                                Karen Chuang Kline
                                                Florida Bar No. 59998
                                                Duane Morris LLP
                                                Boca Center Tower II
                                                5100 Town Center Circle, Suite 650
                                                Boca Raton, FL 33486-9000
                                                Telephone: 561-962-2132
                                                Facsimile: 305-397-2248

                                                *Attorneys for Defendant Yellow Pages Group, LLC*

---

[6] .0027 x 123,000 = $332; .0011 x 123,332 = $136; .0014 x 123,468 = $173; .0012 x 123,641 = $148; $148 ÷ 365 = $/41 X 86 days (i.e., Jan. 1, 2014 until March 27—the day of the verdict) = $35.  $332 + $136 + $173 + $35 = $676.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 9, 2014, I electronically filed the forgoing with the

Clerk of the Court by using CM/ECF system, which will send electronic filing to all counsel of

record.

/s/ David J. Wolfsohn
David J. Wolfsohn